UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES F. LONGNECKER, II,

                     Plaintiff,            Civil Action No. 15-11705
                                            Honorable John Corbett O'Meara
                                            Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                     Defendant.
_____/

## ORDER ON PLAINTIFF'S MOTION FOR TRUE DISCOVERY [45]

## and

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [48, 51]

      Plaintiff Charles F. Longnecker, II ("Longnecker") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Longnecker has filed at least four separate documents, including a motion for summary judgment, setting forth numerous arguments as to why the Administrative Law Judge ("ALJ") wrongly denied benefits in his case. (Docs. #44, 45, 46, 48). With the Court's permission, the Commissioner filed a consolidated response to all of these filings (Doc. #51), and Longnecker then filed a reply brief (Doc. #53). On May 13, 2015, the District Court referred this case to the undersigned for determination of all non-dispositive motions pursuant to 28 U.S.C. §636(b)(1)(A) and issuance of a report and recommendation pursuant to 28 U.S.C. §636(b)(1)(B) and (C). (Doc. #3).

I.    **REPORT**

A.    **Procedural History**

On April 18, 2012, Longnecker filed an application for DIB, alleging a disability onset date of July 17, 2001.[1]  (Tr. 125-26).  This application was denied initially on September 12, 2012.  (Tr. 43-47).  Longnecker filed a timely request for an administrative hearing, which was held on September 9, 2013, before ALJ Earl Ashford.  (Tr. 19-34).  Longnecker, who was not represented by an attorney, was the only witness to testify at the hearing.  (*Id.*).  On November 15, 2013, the ALJ issued a written decision finding that Longnecker was not disabled under the Act at any time from July 17, 2001 (the alleged onset date) through December 31, 2004 (his date last insured).  (Tr. 8-13).  On February 27, 2015, the Appeals Council denied review.  (Tr. 1-3).  Longnecker filed for judicial review of the final decision on May 12, 2015.  (Doc. #1).

B.    **Background**

1.    *Longnecker's Disability Reports*

Longnecker was born in May of 1962, which made him 51 years old at the time of the administrative hearing.  (Tr. 135).  In a disability function report, he indicated that he lived alone "outside."  (Tr. 145).  He completed the eighth grade but had no further education.  (Tr. 139).  He indicated that he stopped working in 1999 when he was incarcerated.  (Tr. 138).  Before that, he worked in various construction jobs.  (Tr. 139).

Longnecker alleges disability as a result of multiple physical and mental conditions, including back and hip injuries, severe migraine headaches, post-traumatic stress disorder, bipolar disorder, and agoraphobia.  (Tr. 138).  He indicated that pain interferes with walking, standing, lifting, and bending, and he has difficulty being around other people.  (Tr. 145).  He

---

[1] On April 30, 2012, Longnecker also filed an application for Supplemental Security Income ("SSI"), which was approved in October 2012.  (Tr. 48-63).

2

has difficulty with personal care, including shaving and using the toilet.  (Tr. 146).  He needs reminders to take medication, and indicated that "someone else sets out [his] medication weekly."  (Tr. 147).  He does not do house work or yard work because he is "crippled in wheelchair most of the time."  (Tr. 148).  Indeed, Longnecker indicates that he uses various aids, including crutches, a walker, a wheelchair, a handicapped rail and ramps, and a shower bench.  (Tr. 148, 151).  He cannot drive, does not shop, and does not socialize because he does not like to be around people.  (Tr. 148-50).  He does not get along well with authority figures because "torture and abuse of authority [are the] reason for [his] injuries."  (Tr. 151).  He suffers from panic attacks and agoraphobia and does not handle stress or changes in routine well.  (*Id.*).

2.    *Efforts to Obtain Medical Evidence*

While the SSA deemed Longnecker disabled as of April 2012, the primary issue before the Court is whether the ALJ erred in finding that there was insufficient evidence of a medically determinable impairment prior to his date last insured (December 31, 2004).  In various filings with the Court, Longnecker asserts that the administrative record "is neither full nor complete" (Doc. #44 at 2), and that the Commissioner failed to take appropriate steps to obtain his medical records from the Michigan Department of Corrections ("MDOC") (Doc. #48 at 1-3).  Thus, the Court will detail the efforts made to obtain these medical records.

In a disability appeals report dated October 16, 2012, Longnecker indicated as follows:

> The Michigan Dept. of Corrections has medical records currently not in possession of Social Security Admin.  That the majority of the serious spinal, torso, neck and head injurys [sic] in one instant were suffered on or around the date July 11, 2001 on state property, by employees of the stat[e] of Michigan.
>
> *        *        *
>
> Of note:  I did not receive proper or adequate medical attention while under the authority of MDOC from date of injuries till 2008[.]  I was not aware that the date of disabling injury was at issue until I received the

3

> denial letter from Social Security.  I have not ever reviewed the medical
> records kept by MDOC but I would hope they bare reference adequate for
> Social Security to establish confirmation.  I will attempt to supply what
> papers I have in my possession but my personal file is partial at best.

(Tr. 188).

In a letter received by the Office of Disability Adjudication and Review ("ODAR") on June 13, 2013, Longnecker stated that he had reviewed the file CD containing medical records and found "no mention of records from the Michigan Department of Corrections …."  (Tr. 208-11).  He again provided his inmate number, along with the names and addresses of the facilities at which he had been incarcerated (in chronological order):  (1) State Prison Southern Michigan; (2) Mound Regional Correctional Facility; (3) St. Louis Correctional Facility; (4) Alger Maximum Correctional Facility; and (5) Standish Maximum Correctional Facility.  (Tr. 208). Additionally, Longnecker provided information for two county jails (Monroe County Jail and Washtenaw County Jail) that he believed might have medical records reflecting physical and psychiatric treatment he received prior to July 2001.  (Tr. 208).

As a result, the Social Security Administration sent requests for medical records (from July 17, 2001 to the present) to each of these state correctional facilities and county jails.  (Tr. 246-47, 249-50, 252-53, 255-56, 258-59, 261-62, 264-65).  The request to Standish Maximum Correctional Facility was "returned to sender" as "vacant."  (Tr. 239).  The request to Mound Regional Correctional Facility was "returned to sender," as the forwarding time had expired (an alternate address was provided on the notice).  (Tr. 240).  The requests to the county jails were answered, but there were either no records for Longnecker or the records had been destroyed. (Tr. 421-23, 470-74).

A June 27, 2013 Report of Contact, prepared by ODAR, indicates that a records maintenance representative at Alger Maximum Correctional Facility identified a possible

4

discrepancy between the birthdate provided by Longnecker to the Social Security Administration and the birthdate the prison had on file for him.  (Tr. 213).  As a result, ODAR left Longnecker a message and asked him to call back.  (*Id.*).  On July 8, 2013, ODAR advised Longnecker of the returned mail from the correctional facilities, which prompted him to ask that subpoenas be sent out to these facilities.  (Tr. 215).  Longnecker also indicated that he would "send in medical documents that show[] that he was in a wheelchair before 2004."  (*Id.*).  An August 2, 2013 Report of Contact indicates that ODAR advised Longnecker of the status of the records requests, as set forth above.  (Tr. 216).  ODAR did receive some medical records from the MDOC, printed on July 2, 2013, which document at least some of Longnecker's medical treatment from June 21, 2004 through October 9, 2007.  (Tr. 424-68).

In a letter received by ODAR on August 2, 2013, Longnecker reiterated that he was injured by MDOC employees in July 2001, submitted what he claimed were "two of the several hundred misconduct reports" he received during his incarceration,[2] and speculated that the MDOC was "actively and deliberately trying to block any release of [his] files."  (Tr. 229).  In an "Affidavit of Truth" received by ODAR on August 8, 2013 (Tr. 219-25), Longnecker again indicated that, on or about July 17, 2001, he was "assaulted and grievously injured by corrections officers," resulting in physically disabling injuries.  Longnecker asked for issuance of subpoenas for his prison medical records and questioned his prison discharge in July 2008, claiming that the MDOC should have taken steps to refer him (as a disabled person) to local welfare authorities before his release.  (Tr. 220-21).

On August 14, 2013, the ALJ issued subpoenas for medical records to the following MDOC facilities:  St. Louis Correctional Facility (Tr. 110-12); State Prison Southern Michigan

---

[2] These records are discussed at Section I(B)(4), *infra*.

(Tr. 114-16); Mound Regional Correctional Facility (Tr. 118-20); and Washtenaw County Jail (Tr. 122-24).  On August 26, 2013, the St. Louis Correctional Facility sent a letter indicating that it had received the request for Longnecker's medical records.  (Tr. 244-45).  The letter further indicated that because Mr. Longnecker had been discharged from the MDOC more than five years earlier, his records had been sent to MDOC Central Record Storage and that the request had been "forwarded to Duane Waters Health Center, Release of Information Department for paroles and discharges."  (*Id.*).

### 3.   *Longnecker's Hearing Testimony*

Longnecker appeared *pro se* at the September 9, 2013 administrative hearing.  (Tr. 19-34).  He continued to maintain that certain "crucial records" were "either being delayed or refused by the Department of Corrections."  (Tr. 23).  The ALJ then explained efforts taken by the Social Security Administration to obtain Longnecker's MDOC medical records, saying:

> Okay, now, not only did we make an initial attempt to get those records and follow up on them, but after my assistant advised me that she had been unsuccessful in obtaining those records initially and that she had initial discussions with you.  I issued subpoenas to the various penal institutions that you listed in an attempt to get the records subpoenaed and the only thing we've gotten back so far other than the few records that are already in the file [are] indications that those records no longer existed.  That they've been destroyed by virtue of the amount of time that has passed.  So, that's what the status is at this time.

(Tr. 23-24).  The ALJ went on to explain that he needed medical records showing that Longnecker was disabled prior to December 31, 2004.  (Tr. 24-25).

Longnecker then indicated that he did not believe he had additional mental health (as opposed to physical health) records and said that "it would be a heck of a time for me to find them."  (Tr. 25).  Longnecker asserted that his MDOC records should not have been destroyed because, according to the "Paperwork Reduction Act," they should have been available for ten years following his discharge from prison.  (Tr. 25-26).  The ALJ then stated:

6

> Well, let me say this; in addition to whatever else other information we've been given there is a letter in the file dated August 26, 2013, to this office indicating that this request for records have been forwarded to a particular individual within the State of Michigan, so that particular person has not responded to that transfer of –

> \*　　　\*　　　\*

> … **as I indicated that August 26, 2013 communications to you the last thing we heard and that may or may not have been a final communication, but there was an indication that the request made by Social Security had been forwarded to another individual, and at this point and time we haven't heard from that individual, and so I can't say what's going to finally happen with regard to that particular referral to a central location for the Department of Corrections records, but that's where it stands today.**

(Tr. 26-27 (emphasis added)).  Longnecker then testified that, on or about July 17, 2001, he was "beaten by 13 or more correction officers while shackled and chained during a medical examination."  (Tr. 29).  He further testified that this beating resulted in spinal, hip, and head injuries.  (*Id.*).  He reiterated that it was "vital and necessary for the Department of Corrections to release [his] medical file," as it would establish that he was severely injured prior to 2004.  (*Id.*).  When the ALJ then asked Longnecker if he was "going to submit the additional medical evidence" he had, Longnecker said, "I will give you everything that I can get."  (Tr. 30).  The ALJ then said:

> Okay, I'm going to keep the record open.  Today is September 9.  I'm going to keep the record open for almost two months, so I will not close the record and make a decision until November 8, 2013.  **If you have any records to submit, I need them by that date.  Otherwise, I'll be deciding your case by the testimony and evidence that I've taken today and the evidence that's in the file.**

(Tr. 31-32 (emphasis added)).

### 4.   *Relevant Medical Evidence*

The administrative record contains very little medical evidence pertaining to Longnecker's condition between July 2001 and December 2004.  Correctional records from the

7

MDOC show that Longnecker had a major misconduct hearing due to a charge of failure to follow an order of a corrections officer on March 12, 2002.  (Tr. 234, 236).  In that instance, Longnecker was told to "get on the bus," but he did not, saying that he could not; apparently, he was in a wheelchair and the bus did not have wheelchair accessibility.  (Tr. 234).  Although there was apparently some dispute as to whether Longnecker could in fact get on the bus, as he had been "medically cleared for transfer," he eventually was found not guilty of the misconduct because "the evidence as a whole [did] not show that Prisoner Longnecker could have physically compl[ied] with the order to get on the bus when the order was given …. (Tr. 234).

In a separate incident, on March 22, 2002, Longnecker refused an order to walk up the stairs to his cell, claiming he was unable to do so, which prompted another major misconduct hearing.  (Tr. 232).  He was found guilty this time, with a notation that medical staff thoroughly examined him and found that he could "walk without assistance but he refuses to do so in addition to refusing testing of areas he claims affect his ability to walk."  (*Id.*).

In February 2007, Longnecker was seen at Standish Maximum Correctional Facility for an allegedly "long history" of back pain, after he fell out of his wheelchair.  (Tr. 437-38).  He was found to have impaired physical mobility and alteration in comfort secondary to stated lower back pain.  (*Id.*).  In an April 2007 report, the examiner noted multiple musculoskeletal conditions, all with an onset date of October 5, 2006, and he was placed on suicide watch.  (Tr. 439).  In September 2007, Longnecker was noted to have the same musculoskeletal diagnoses, along with a disorder of muscle/ligaments and leg weakness requiring a wheelchair, with an onset date of July 9, 2007.  (Tr. 459).

The record also contains medical records from St. Mary's of Michigan from a June 2008 hospitalization, which occurred fairly shortly after Longnecker's release from prison.  At that

time, Longnecker complained of having back problems "on and off for the last 6-7 years."  (Tr. 270).  When describing the history of his present illness, Longnecker indicated that he had been experiencing "increased pain with walking" and had "been using a wheelchair recently" (Tr. 275); in another report from the same hospitalization, however, Longnecker reported having been "virtually wheelchair bound since an assault in prison since 2001," having received "minimal medical treatment" while in prison, and having experienced "significant problems with chronic pain and poor mobility since that time" (Tr. 277).

Medical records from Family Physician Associates from August 2008 to June 2012 are also somewhat inconsistent in terms of Longnecker's reported in-prison injury.  For example, a May 2009 treatment note states:  "In July 2008 he reports being assaulted by jail guards."  (Tr. 360).  This same "July 2008" incident is repeated in records of other visits.  (*E.g.*, Tr. 344, 348, 356, 374, 378).  However, a note from August 2008 indicates:  "The patient reports having longstanding hypertension and back and other generalized pain symptoms due to an assault while in jail in July 2001," saying that he received "incomplete treatment for pain symptoms while in jail, after the incident."  (Tr. 615).  There are other references in the medical records to an assault that occurred in prison in July 2001, as well as Longnecker's complaints that he received inadequate medical attention while incarcerated.  (*E.g.*, Tr. 382, 386, 390).

### C.      Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be

determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**D.    The ALJ's Findings**

At Step One of the five-step sequential analysis, the ALJ found that Longnecker has not engaged in substantial gainful activity since July 17, 2001 (the alleged onset date).  (Tr. 10).  At Step Two, the ALJ found that, through Longnecker's date last insured (December 31, 2004), there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment.  (*Id.*).  Thus, the ALJ concluded that Longnecker was not disabled under the Act at any time between July 17, 2001 (the alleged onset date) and December 31, 2004

(the date last insured).  (Tr. 12).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals

Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion'").

**F.    Analysis**

As set forth above, Longnecker argues in his various court filings that the administrative record "is neither full nor complete," and that the Commissioner failed to take appropriate steps to obtain his MDOC medical records, which were "important and necessary for a fair adjudication of his disability claim …." (Doc. #44 at 2; Doc. #45-1 at 2; Doc. #48 at 1-3). While the Commissioner did take some meaningful steps to attempt to obtain these records, for the reasons set forth below, the Court finds it is appropriate to require that certain medical records be further pursued before the ALJ makes a final determination in this action.

*1.    The ALJ Failed to Adequately Develop the Record*

*a.    The Applicable Legal Standards*

While the claimant bears the ultimate burden of establishing that he is entitled to disability benefits, courts have recognized that social security proceedings are "inquisitorial

rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000).  As a result, an ALJ has an affirmative duty to develop the factual record upon which his decision rests, regardless of whether the claimant is represented by legal counsel at the administrative hearing.  *See Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983) (citing *Richardson v. Perales*, 402 U.S. 389, 410 (1971) (recognizing that the responsibility for ensuring that every claimant receives a full and fair hearing lies with the administrative law judge)).

However, where the claimant is without counsel, incapable of presenting an effective case, and unfamiliar with hearing procedures, the ALJ has a "special, heightened duty" to develop the administrative record and ensure a fair hearing.  *See Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008) (citing *Lashley*, 708 F.2d at 1051-52); *Nabours v. Comm'r of Soc. Sec.*, 50 F. App'x 272, 275 (6th Cir. 1986).  To satisfy this duty, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," and must be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Lashley*, 708 F.2d at 1052 (internal citations omitted).  This is especially true in situations where the unrepresented claimant suffers from a mental impairment.  *See Morlando v. Astrue*, 2011 WL 4396785, at *4 (D. Conn. Sept. 20, 2011) ("In addition to the special solicitude required for *pro se* claimants, the Second Circuit has also emphasized the extra care necessary 'when adjudicating the claims of a litigant whose mental capacity is in question.'") (internal citations omitted).

Whether an ALJ has satisfied his "special, heightened duty" to develop the record is determined on a case-by-case basis.  *See Osburn v. Apfel*, 1999 WL 503528, at *7 (6th Cir. July 9, 1999) (internal citation omitted).  Although there is no bright line test to be applied, courts have recognized that, "Failure by an ALJ to fully develop the factual record in a particular matter

is often evidenced by superficial or perfunctory questioning, as well as a *failure to obtain all available medical records and documentation.*" *Vaca v. Comm'r of Soc. Sec.*, 2010 WL 821656, at * 6 (W.D. Mich. Mar. 4, 2010) (emphasis added) (citing cases). Indeed, courts have explicitly stated: "An ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing." *Figard v. Comm'r of Soc. Sec.,* 2010 WL 3891211, at *7 (W.D. Mich. July 1, 2010) (quoting *Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996)).

This is particularly true in situations where the ALJ's duty to develop the record intersects with the "treating physician rule," which requires an ALJ to give controlling weight to the opinions of a claimant's treating physicians, so long as those opinions are well-supported by clinical evidence and not inconsistent with the other substantial evidence in the record. *See, e.g., Williams v. Barnhart*, 2007 WL 924207, at *7 (S.D.N.Y. Mar. 27, 2007) (citing 20 C.F.R. §404.1527). Because the opinions of a treating physician are of critical importance, "When the record before the ALJ is incomplete or inadequate, an ALJ's failure to request the opinion of a *pro se* claimant's treating physician is grounds for remand." *Id.* at *8; *see also Watt v. Astrue*, 2011 WL 3319993, at * 5 (C.D. Cal. July 28, 2011).

b.    *The ALJ Did Not Adequately Discharge His Heightened Duty to Develop the Record*

In this case, Longnecker clearly stated in an October 2012 disability appeals report that the MDOC had medical records reflecting the injuries he allegedly suffered in prison in July 2001. (Tr. 188). After he received and reviewed the CD containing his medical records, he sent a letter to ODAR indicating that he found "no mention of records from the Michigan Department of Corrections …." (Tr. 208-11). He again provided his inmate number, along with the names and addresses of the facilities at which he had been incarcerated, and asked that steps be taken to

14

obtain these records.  (Tr. 208).  ODAR subsequently sent out requests for records, which did not prove particularly fruitful.  As a result, Longnecker reiterated in a letter received by ODAR on August 2, 2013, that he was injured by MDOC employees in July 2001 and speculated that the MDOC was "actively and deliberately trying to block any release of [his] files."  (Tr. 229).

At Longnecker's request, on August 14, 2013, the ALJ issued subpoenas for medical records to the MDOC facilities at which Longnecker had been incarcerated.  (Tr. 110-12, 114-16, 118-20, 122-24).  On August 26, 2013, the St. Louis Correctional Facility sent a letter indicating that it had received the subpoena for Longnecker's medical records.  (Tr. 244-45).  The letter further indicated that because Mr. Longnecker had been discharged from the MDOC more than five years earlier, his records had been sent to MDOC Central Record Storage and that the request had been "forwarded to Duane Waters Health Center, Release of Information Department for paroles and discharges."  (*Id.*).

At the administrative hearing, the ALJ acknowledged receipt of this letter from the St. Louis Correctional Facility, saying:

> Well, let me say this; in addition to whatever else other information we've been given there is a letter in the file dated August 26, 2013, to this office indicating that this request for records have been forwarded to a particular individual[3] within the State of Michigan, so that particular person has not responded to that transfer of –
>
> *       *       *
>
> … as I indicated that August 26, 2013 communications to you the last thing we heard and that may or may not have been a final communication, but there was an indication that the request made by Social Security had been forwarded to another individual, and at this point and time we haven't heard from that individual, and so I can't say what's going to finally happen with regard to that particular referral to a central location for the Department of Corrections records, but that's where it stands

---

[3] As Longnecker points out (Doc. #53 at 4-5), it appears that the ALJ mistakenly believed "Duane Waters" to be a person, rather than what it is – a prison health care facility.

today.

(Tr. 26-27).   Longnecker reiterated that it was "vital and necessary for the Department of Corrections to release [his] medical file," as it would establish that he was severely injured prior to his date last insured of December 31, 2004.  (Tr. 29).

The Commissioner first argues that *Wilson's* "heightened duty" standard does not apply here because "there is no evidence that [Longnecker] was in any way 'incapable of presenting an effective case' or 'unfamiliar with hearing procedures.'"  (Doc. #51 at 18).  While the Court agrees that Longnecker's apparently self-prepared filings in this case suggest he has some level of understanding of the relevant issues, the Court cannot reach the same conclusion with respect to his understanding of (and ability to handle) the relevant hearing procedures.  At the time of the hearing, Longnecker, who has an eighth grade education, was wheelchair-bound and essentially homeless.  (Tr. 139, 145).  His "testimony" was short, amounting to only 11 transcript pages, most of which was actually the ALJ engaging in lengthy soliloquies.  Indeed, Longnecker's "testimony" consisted primarily of vague statements that he was "kicked out of school" and "spent most of [his] time in prison" because of his "mental situation"; that he was "bi-polar and manic depressive"; that he was "severely beaten by 13 or more correction officers while shackled and chained during a medical examination"; that the requests for medical records were being "delayed or refused" by the MDOC; and that if the MDOC produced his medical records, such "would be sufficient to prove that [he] was disabled prior to 2004."  (Tr. 23, 25, 29, 30).  Under these circumstances, and in light of Longnecker's alleged mental infirmities, including bipolar disorder,[4] the Court concludes that the ALJ did, in fact, have a heightened duty to develop the

---

[4] Indeed, in a September 1, 2012 report, the consultative examiner, Gayle Oliver-Brannon, Ph.D., listed Longnecker's diagnoses as bipolar disorder, panic disorder with agoraphobia, and post-traumatic stress disorder, and opined that he "appears in need of mental health treatment and does not present as a viable candidate for employment at this time."  (Tr. 418).

record.

The Commissioner next argues, in the alternative, that even if "special circumstances" did exist such that the ALJ had a heightened duty to develop the record, he properly discharged any duty he owed to Longnecker.  (Doc. #51 at 18-20).  Specifically, the Commissioner asserts that the ALJ (1) advised Longnecker that he needed to provide evidence of a medical impairment before December 31, 2004 (Tr. 28); and (2) made clear to Longnecker that he had 60 days to present additional evidence, saying "[o]therwise, I'll be deciding your case by the testimony and evidence that I've taken today and the evidence that's in the file" (Tr. 31-32).

The Court disagrees that the ALJ "properly discharged any duties owed" to Longnecker in this case.  (Doc. #51 at 18).  It appears from a review of the administrative record that the most important medical evidence that should have been before the ALJ was missing.[5]  The Court is not persuaded by the Commissioner's argument that the ALJ essentially did enough when he "clearly told [Longnecker] that if he received no additional records, then he would make a decision based upon the evidence already of record."  (*Id.* at 20).  The Commissioner seeks to

---

[5] The Commissioner also argues that "it appears that the ALJ secured all available MDOC records[,]" noting that he "received copies of medical records covering treatment, including records from the Standish and Alger correctional facilities – the last two correctional facilities where [Longnecker] was imprisoned …."  (Doc. #51 at 22-23 (citing Tr. 11, 424-68)).  The Commissioner further contends that, "Even if records of earlier treatment appear sparse, [Longnecker] himself has acknowledged, in post-incarceration medical records, that he only received minimal medical care while in prison …."  (*Id.* at 23 (citing Tr. 277)).  The Court is not persuaded by this argument.  The records referenced by the Commissioner primarily appear to be various mental health assessments, referrals, and progress notes, and contain virtually no reference to treatment provided for any physical impairment.  Given Longnecker's contention that he received treatment for injuries incurred in July 2001 – including x-rays after suffering a "dislocated hip, compound fractures of two carpal bones in his left hand, and multiple bruises and lacerations upon his entire body …" (Doc. #53 at 8), it seems reasonably likely that additional records exist.  Moreover, as the Commissioner concedes, Longnecker attached additional records to his "Amendment of Claim" – including some prison medical records providing for a cane from March 2002 through July 2002, and a wheelchair for periods of time in 2006 and 2007 – which further undermine the Commissioner's argument that the ALJ had "secured all available MDOC records."  (Doc. #46 at 6, 28-31, 33).

distinguish this case from *Burrows v. Comm'r of Soc. Sec.*, 2012 WL 5411113 (E.D. Mich. Sept. 28, 2012), in which the court found that the ALJ had not fulfilled his heightened duty to develop the record and remanded the case for further proceedings.  In *Burrows*, part of the analysis was the fact that the ALJ had specifically informed the unrepresented claimant that "he would attempt to obtain relevant treating physician records, but apparently did not do so."  *Id.* at *11. The Commissioner is correct that, here, "the ALJ made no such representation" (Doc. #51 at 19), but the Court does not find this fact dispositive.  Indeed, if an ALJ could satisfy his duty to develop the record by merely telling a claimant "that if he receive[s] no additional records, then he [will] make a decision based upon the evidence already of record," as the Commissioner suggests (*Id.* at 20), then the so-called "heightened duty" requirement would be eviscerated.

Moreover, as the Commissioner points out, there is a relevant provision of the Hearings, Appeals, and Litigation Law Manuel ("HALLEX"), which – although not binding – provides "procedural guidance" under the circumstances.  (Doc. #51 at 21-22).  HALLEX I-2-5-82, entitled "Noncompliance With a Subpoena," provides that if an individual refuses or fails to comply with a subpoena:

> … **the ALJ must consider any changes in the situation since the subpoena was first issued and again determine whether the evidence or facts requested are reasonably necessary for the full presentation of the case.**  If so, the ALJ will prepare a memorandum to the OGC Regional Chief Counsel requesting enforcement of the subpoena … and transmit the memorandum to the OGC Regional Chief Counsel ….

HALLEX  I-2-5-82,  found  at  https://ssa.gov/OP_Home/hallex/I-02/I-2-5-82.html  (emphasis added) (last accessed May 20, 2016).  By issuing subpoenas for Longnecker's medical records, then, the ALJ implicitly determined that these records were reasonably necessary for a full presentation of Longnecker's case.  *See Bennett v. Colvin*, 2016 WL 308777, at *4 (N.D. Ohio Jan. 26, 2016).  Beyond that, however, it is not entirely clear whether the ALJ complied with the

above provision, as the decision makes no mention of whether there were any "changes in the situation" since the time the subpoena(s) were issued and contains no explanation as to whether the subpoenaed records remained "reasonably necessary for full presentation of the case." HALLEX I-2-5-82. The Commissioner's conclusory argument that "it is apparent that the ALJ determined that the evidence requested by the subpoena was *not* 'reasonably necessary for the full presentation of the case'" is not persuasive. (Doc. #51 at 21 (emphasis in original)). This is not a situation where the subpoena at issue sought redundant or unnecessarily cumulative information. Here, given the centrality of the MDOC records to a fair adjudication of Longnecker's claims and the efforts made by Longnecker to obtain these records, the ALJ's failure to follow up on the letter he received in response to the subpoena he issued, indicating that these records had been sent to MDOC Central Record Storage, prejudiced Longnecker's right to a full and fair hearing on the merits, and therefore constitutes error warranting remand.[6] *See Rabbers*, 582 F.3d at 654.

> 2.    The ALJ's Determination that Longnecker is
>        Not Disabled is Not Supported by Substantial Evidence

For all of the reasons set forth above, the ALJ's determination that Longnecker is not disabled is not supported by substantial evidence. The administrative hearing in this case was essentially nothing more than a discussion about medical records that had not been obtained. Without these records – which purportedly reflect medical treatment Longnecker received between 2001 and 2004 – the ALJ's conclusion at Step Two that Longnecker did not have a

---

[6] The Commissioner also argues that remand would "likely be futile" because, pursuant to the MDOC Records Retention and Disposal Schedule, Longnecker's medical records would have been destroyed within seven (7) years of his 2008 release from prison. (Doc. #51 at 23). While it is certainly possible that, after this much time, Longnecker's MDOC medical records no longer exist, the Commissioner has not established with certainty (for example, via an affidavit of the keeper of records) that such records no longer exist. Thus, given the possibility that such records remain in existence, the Court believes that remand is appropriate.

medically determinable impairment during the relevant period of time is not supported by substantial evidence. *See, e.g., Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984) (when an ALJ fails to develop the record, he does not have sufficient facts to make a decision and, thus, his decision is not supported by substantial evidence). On remand, the ALJ should attempt to obtain medical records from the MDOC and explain the consideration he gives to such records in formulating his decision as to whether Longnecker is disabled under the Act.

## II.     RECOMMENDATION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [51] be DENIED, Longnecker's Motion for Summary Judgment [48] be GRANTED IN PART, the ALJ's decision be REVERSED, and this case be REMANDED for further proceedings consistent with this Recommendation.[7]

Dated: May 25, 2016                              s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge


### NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140

---

[7] On February 2, 2016, Longnecker filed a "Motion for True Discovery," seeking production of his MDOC medical records. (Doc. #45). Because the Court is recommending that Longnecker's motion for summary judgment be granted, and that this case be remanded for further proceedings – including obtaining these records – his "Motion for True Discovery" [**45**] is **DENIED AS MOOT**.

(1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 25, 2016.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager